UNITED STATES DISTRICT COURT

FOR THE

WESTERN DISTRICT OF VIRGINIA

ROANOKE DIVISION


```
* * * * * * * * * * * * * * *
ROBERT CHARLES GLEASON, JR.,*
ALSO KNOWN AS               *
ROBERT CHARLES GLEASON,     * CIVIL NO. 7:12-CV-00619
                            * JANUARY 4, 2013  12:58 P.M.
            Plaintiff,      * MOTION HEARING
                            * VOLUME I OF I
vs.                         *
                            *
EDDIE L. PEARSON, WARDEN,   *
SUSSEX I STATE PRISON,      * BEFORE:
                            * HONORABLE GLEN E. CONRAD
            Defendant.      * UNITED STATES DISTRICT JUDGE
* * * * * * * * * * * * * * * WESTERN DISTRICT OF VIRGINIA
```

APPEARANCES:

For the Plaintiff:        JONATHAN PAUL SHELDON, ESQUIRE
                          Sheldon & Flood, PLC
                          10621 Jones Street, Suite 301A
                          Fairfax, VA 22030



For the Defendant:        KATHERINE BALDWIN BURNETT, ESQUIRE
                          Commonwealth of Virginia
                          Office of the Attorney General
                          900 East Main Street
                          Richmond, VA 23219



Court Reporter:           Judy K. Webb, RPR
                          P.O. Box 1234
                          Roanoke, Virginia 24006
                          (540)857-5100 Ext. 5333


          Proceedings recorded by mechanical stenography,
transcript produced by computer.

1          (Court convened at 12:58 p.m.)

2          THE COURT:  Good afternoon.  I'll ask the clerk to

3    announce the style of the next matter.

4          THE CLERK:  *Robert Charles Gleason, Jr., v. Eddie L.*

5    *Pearson*, Case Number 7:12-CV-00619.

6          THE COURT:  As I understand it, this matter arises on

7    a motion to appoint counsel, filed by Mr. Jonathan Sheldon and

8    others.

9          Who wishes to be heard in support of the motion?

10         MR. SHELDON:  Jonathan Sheldon, Your Honor.

11         THE COURT:  Yes, sir.  What do you have to say about

12   the matter?

13         MR. SHELDON:  Good afternoon.

14         THE COURT:  Good afternoon.

15         MR. SHELDON:  I would like to first start by just

16   acknowledging that if Mr. Gleason is competent and he doesn't

17   want counsel, that's his right.  But we have represented

18   Mr. Gleason for some time now in state habeas proceedings, and

19   now those proceedings are over and we have substantial and

20   serious concerns about his competency.

21         We don't believe, first, that the competency

22   evaluation that was done 15 months ago was accurate or

23   complete; and second, that there is substantial change in

24   circumstances since Mr. Gleason has been in solitary

25   confinement on death row.  And because of our interaction with

1  him over the last year, over matters in which he has wished

2  our assistance -- acknowledging that he does not wish our

3  assistance in overturning his death sentence -- but in helping

4  him on a number of matters which he asked us to help him with,

5  he has been uncooperative.

6          And I can make a detailed proffer to this Court, if

7  this Court would like to hear my proffer regarding our

8  concerns of his competence.

9          THE COURT:  Yes.  Proceed.

10         MR. SHELDON:  So, first, the change in circumstances

11 in the last 15 months since he was evaluated by Dr. Hagan.

12 Our substantial concerns are that he has been completely

13 uncooperative and irrational in those matters in which he has

14 requested our assistance.  Just for example, he has asked us

15 to help him with his mail privileges, but what he has done and

16 what he has told us have hindered us in helping with his mail

17 privileges.

18         He has had limited phone privileges from the prison.

19 He has asked us to help him with his phone privileges, but his

20 behavior and what he has told us has hindered his ability to

21 get phone privileges and our ability to help him.

22         He has asked us to visit with him, and then when I've

23 attempted to visit with him, he's not come out, and most of

24 the reason he has not come out has to do with what he is

25 required to wear when he comes out.

He has asked us to obtain the sentencing transcript, and when we got him the sentencing transcript and provided it to him, he did not accept it because he would not sign his name, apparently.

We have tried to meet with him. We have tried to talk to him about legal issues that he does care about and he does want our help with. And at every turn, he has hindered us helping him for those things that he does want help with.

In addition, when he calls us -- I personally have had only one short telephone conversation with Mr. Gleason, and I've never met with him, because when I've tried, he has not come out.

Mr. Flood, who is on the motion with me and was my co-counsel in state habeas, has spoken to Mr. Gleason over 20 times. He has told me that Mr. Gleason has extremely pressured speech, perseverates continuously, and I have overheard many conversations where the conversation is almost entirely one way.

Our conversations are limited to approximately 18 minutes because of the telephone system with the prison, and Mr. Gleason talks most of that time, and most of the time that he talks, it's repeating, it's pressured speech, it's talking about things that are not helping us get what he does want.

He has deteriorated physically, apparently. He has very rarely gone out for any recreation, despite the fact that

for 15 months he has been in solitary confinement.

He has exhibited paranoid behavior. He has told us that the correctional officers are out to get him, that correctional officers are trying to poison him, that he has cancer, and there are other numerous things in which he has expressed paranoid behavior.

We've talked to people who knew him at the time of his evaluation 15 months ago, and who have seen him since. And one such person is Mary Lynn Tate, a lawyer who the warden talks about, the civil suit, the *Strickland* civil suit, in her pleading.

Mary Lynn Tate is the lawyer prosecuting that civil suit, and she met with Mr. Gleason prior to Mr. Gleason's death sentence. And she met with Mr. Gleason recently, very recently, and she told me that his condition has deteriorated significantly from when she first saw him about 15 or 16 months ago. She told me that he was depressed, withdrawn, had not gone out for recreation, and seemed very different to her than when she had first seen him over a year ago.

We have watched videos of Mr. Gleason when he was at trial, in front of Judge Kilgore in the state circuit court, and we have -- or Mr. Flood has spoken with him on the phone and has met with him twice, and Mr. Flood believes his condition has deteriorated significantly.

Those are the facts that I proffer as to why now

Mr. Gleason ought to be evaluated for competency before he is
allowed to make the choice of whether he has counsel or not
and be executed.

We also have serious concerns about the evaluation
that was done 15 months ago. And if the Court would like, I
could get into my concerns with the evaluation that was done
15 months ago.

THE COURT: Well, am I to understand, though, that
the proffer and, indeed, any evidence that you would have the
Court consider consists primarily of your own observations,
those of Mr. Flood, and those of Ms. Tate?

MR. SHELDON: That's right.

We have reviewed the prison records also, and the
prison records indicate suicidal. And I note that's
significant because the evaluation that was done 15 months
ago, at trial, one of his significant findings is he's not
suicidal. So we have reviewed the prison records, and the
mental health folks and the prison records describe him as
suicidal. And because of the nature of death row, that's
right, there are very few other collateral sources we can rely
on.

THE COURT: So any effort that you would make to
impugn the earlier psychiatric studies are based on lay
observations and lay testimony?

MR. SHELDON: No, Your Honor. What I have just told

1  you is not to impugn the evaluation 15 months ago.

2           THE COURT:  You say it changed.

3           MR. SHELDON:  I'm concerned about --

4           THE COURT:  You're concerned about the accuracy --

5           MR. SHELDON:  That's right, new and different.  But I

6  have very other different information --

7           THE COURT:  Well, if you're concerned about the

8  accuracy, that is impugning the other psychiatric evaluation,

9  is it not?

10           MR. SHELDON:  Well, I don't think for this reason,

11  Your Honor, both Dr. Hagan and Dr. Ryan, the two evaluators

12  who were appointed at trial, have noted that -- and this is in

13  many cases, too -- competency is something that can be

14  ephemeral.  It can change easily, and it can change on

15  circumstances, it can change on stress.

16           So to say that now Mr. Gleason is not competent, I

17  don't think -- I'm not necessarily, and I don't mean to use

18  the evidence that we have now to say that that evaluation

19  was -- to impugn that evaluation.  However, I am going to

20  impugn that evaluation with other evidence that I can tell the

21  Court about.

22           THE COURT:  Okay.  Go ahead.

23           MR. SHELDON:  So that other evaluation.  First, there

24  were two cases.  There was the Watson case first, the case

25  where Mr. Watson was killed.  And Dr. Eileen Ryan was

appointed by the circuit court to evaluate Mr. Gleason and in

March of 2010 found Mr. Gleason competent in the report and

provided that to the Court.

Sometime thereafter -- and this is not in the record,

and that's important because the warden indicates the record

shows no evidence of his being anything other than competent.

However, not in the record is a letter from Eileen Ryan almost

a year after her original evaluation, and that letter to trial

counsel says:  It has come to my attention that Mr. Gleason's

self-destructive behavior has intensified.  His pattern of

irrational decision-making has intensified.  His reasoning

that he claims to be employing in his case makes no sense; it

differs dramatically from what he described to me.  The

reasons he attributes to his current decision-making are so

far off the mark.  He has lurched so haphazardly and

illogically among various justifications that she has serious

concerns about his competency, wants to be provided with

collateral sources and wants to reevaluate his competency.

Trial counsel filed a motion then to have

Mr. Gleason's competency reevaluated.  However, that never

happened and this letter came to light in the record.  What

happened was Mr. Gleason fired his attorneys and -- the

circuit court allowed Mr. Gleason to fire his attorneys and

then, *pro se*, withdraw counsel's motion to reevaluate him for

competency.

1       So this letter and these opinions that I just read to

2   you are not in the record and never came to light to Judge

3   Kilgore in the circuit court.

4       THE COURT:  As I understand it, there's been a

5   subsequent evaluation.

6       MR. SHELDON:  That's right.  And then subsequent to

7   that, Dr. Hagan was appointed in the Cooper case.  Dr. Hagan

8   interviewed Mr. Gleason and found that he was competent.

9   Dr. Hagan, however, did not consider some extremely serious

10  evidence that trial counsel had, but never provided to

11  Dr. Hagan because they didn't know they had.

12      So, for example, Dr. Hagan says that Mr. Gleason is

13  not and has not been suicidal.  What Dr. Hagan did not have

14  and did not know about, because trial counsel didn't realize

15  they had in their records, were psychiatric records from the

16  John Umstead Hospital in Butner, North Carolina, which were

17  hospitalization records of Mr. Gleason from a suicide attempt.

18  Those records are psychiatric records and were never provided

19  to Dr. Hagan, and he doesn't know about them.  And they

20  indicate --

21      THE COURT:  So have you been able to obtain some

22  statement or some letter from Dr. Hagan which indicates that

23  his opinion might have been different if he had had access to

24  these additional materials?

25      MR. SHELDON:  Well, I'm here, Your Honor, on a motion

1   for appointment of counsel.  And if this Court appoints me, I

2   believe Dr. Hagan and Dr. Ryan would be fact witnesses, and I

3   would like to get an evaluation for competency of --

4          THE COURT:  It seems like that's putting the cart

5   before the horse.  As the matter is presented today, the man

6   was deemed competent on two occasions in evaluations conducted

7   at the behest of the state court.  So I think he comes to us

8   with the presumption that he's competent to make his own

9   decisions here for these purposes.

10         It would seem to be incumbent upon you, if you seek

11  to represent him, to come forward with evidence, and not just

12  mere supposition or suspicion, that would indicate that if we

13  had further evaluations they would indicate something

14  different.

15         MR. SHELDON:  That's right, Your Honor.  Well, I

16  wouldn't argue with this Court's description of the burden of

17  proof.  But I think what any attorney can do in making their

18  proffer of competence, the vast majority of it in every case

19  is going to be their experience with their client, because the

20  major -- major part of the evaluation of competency is ability

21  to assist counsel and rational decision-making, and the only

22  way that's going to come to light is interaction with counsel.

23  So rather than supposition or guess, this is direct evidence

24  that I'm telling the Court we've had from him.

25         THE COURT:  It may or may not be.  You've offered two

different types of evidence.  You say that, first, based on

lay observations, you believe that Mr. Gleason has

deteriorated, and that would consist of the opinions of you,

Mr. Flood, and Ms. Tate.

And then you say that you're concerned that the

earlier psychiatric studies were flawed because the examiners

were not privy to all the evidence.  But you've submitted

nothing under that second prong that would suggest that their

opinions would have been different had they had access to the

information that you say now was withheld from you.

MR. SHELDON:  That's right.  I can submit to the

Court a letter from Dr. Eileen Ryan saying she had serious

concerns.  I also have a letter from the investigator who

worked for trial counsel, but whose information was never

apparently considered by Dr. Hagan.  Dr. Hagan said that --

THE COURT:  You're talking about the suicidal

tendencies?

MR. SHELDON:  There's three points.  One is the

suicidal tendencies; the second is the actual attempt and

hospitalization from the suicide; another one is the long

history of Mr. Gleason of mental health problems that she

discovered through collateral interviews; and the third, which

Dr. Hagan apparently never considered -- and Dr. Hagan also

found that he had no -- relied on his self-report that he had

no substance abuse history, yet trial counsel had in their

records a long history of substance abuse history.

So there's a long history of substance abuse and alcohol abuse, a history of depression and anxiety, and a history of suicide -- talking about suicide and actual suicide attempts, and psychiatric records from the suicide attempt that Dr. Hagan never was provided with and never considered and never acknowledged and apparently never knew about.

We're asking for appointment of counsel so that we can get that evidence to an evaluator and have that evaluator provide an opinion to this Court, in addition to the evidence that I've provided to you from our interactions with him for almost a year of representing him.

MR. GLEASON:  Your Honor --

THE COURT:  Thank you, Mr. Sheldon.

MR. SHELDON:  Thank you.

MR. GLEASON:  -- am I allowed to make some comments?

THE COURT:  You are.  I'm going to hear from you momentarily, but I want to hear from Ms. Burnett first, on behalf of the Attorney General's Office.

MR. GLEASON:  Okay.  Thank you.

MS. BURNETT:  Thank you, Your Honor.

May it please the Court.  It's interesting because I'm not sure where we are here.  In other words, we have counsel who has come in and has said he wants to be appointed under the habeas statute for appointment of counsel.  I don't

know of any standard for competence that would even apply to that type of motion. I mean, that comes down to what does the client want. If he wants counsel, he gets counsel. If he doesn't --

THE COURT: I guess the argument is he is entitled to counsel under the act, under the statute, and whether or not he is able to competently make the decision whether to take advantage of that entitlement may be at issue.

MS. BURNETT: And I'm not sure -- I don't know of any case law that would govern that situation, that would say that there is any type of requirement under that statute for a federal court to determine the competence of the individual before he doesn't hire the attorney. I mean, I don't -- I don't know of any case that addresses that or speaks to it. In fact, what Mr. Sheldon has said this morning is, "Appoint me. You're right, all I have this is this anecdotal information."

There's no documented history of mental illness that would result in incompetence. There's not a single expert opinion in this case ever that this man was incompetent; in fact, quite the opposite. He comes to this Court with a presumption of competence.

And what I'm hearing this morning is Mr. Sheldon saying, "Well, I think he might be, so appoint me so I can now go out and try and prove that." I think that's the cart

before the horse.

I think if he has -- that for his claim to even have any consideration whatsoever, he would first have to come to the Court with some substantial evidence that would rebut that presumption of competence, and it simply doesn't happen in this case.  In fact, all the evidence in the last 15 months -- Mr. Sheldon has talked about a deterioration -- is the opposite.  The letters that Mr. Gleason has written to me, to the Court, to other people, perfectly competent.

Yesterday --

THE COURT:  In your opinion.

MS. BURNETT:  Well --

THE COURT:  And you also are a layperson.

MS. BURNETT:  And the letters speak for themselves, and Your Honor can certainly look at them and read them.  It's an individual who knows very well what his rights are and is articulating exactly what he wants to have happen.  They're coherent and lucid.  There's nothing that would appear to be incompetent whatsoever about that.

Just yesterday, Mr. Gleason was in I think at least an hour-long, maybe longer, deposition in this lawsuit that's going on, in which he was asked questions extensively and answered them, by an attorney in my office who said he understood everything perfectly well.  He was very forthcoming, very lucid, very competent.

1          So I would simply say, Your Honor, that what

2     Mr. Sheldon has come forward with, even if that could be

3     grounds to appoint him under the habeas statute and let him

4     then go out and try and develop some evidence, even if that

5     were the situation, and I have some question as to that, I

6     don't think he has come forward with what he would need to do

7     on that.

8          We have an individual here who -- all I heard this

9     morning was that he's being uncooperative.  Well, he's being

10    uncooperative because he wants to be executed and people are

11    standing in his way, and that comes through loud and clear in

12    everything.

13         And in fact, the only things that Mr. Sheldon says he

14    was uncooperative on were matters that have nothing to do with

15    wanting to challenge his sentence; they are these other

16    peripheral issues about phone call privileges, et cetera, and

17    his apparent frustration with his attorneys over that.  As

18    Your Honor well knows, that's far from showing any type of

19    incompetence.

20         So I would simply say, Your Honor, that I don't

21    think, even under Mr. Sheldon's theory that he could be

22    appointed if there was a showing of incompetence -- and he has

23    failed to make that in this case -- all we have at the end of

24    the day in this case is an individual who has made a very

25    lucid decision that he wants to be executed, that he wants to

go forward with that punishment.  And that is what this

individual has said from the very beginning, has never

wavered.  That has been consistent through trial, sentencing,

appeal.

And Mr. Sheldon said he is through with the habeas.

Well, there never was a habeas because Mr. Gleason did not

want to challenge this in any way.  All he has ever done is

consistently and persistently attempted to have his execution

date set and have punishment carried out, and that does not

demonstrate incompetence.  So, Your Honor, for those reasons,

we would certainly say this motion should be denied.

THE COURT:  Yes, ma'am.

Mr. Gleason, I said I would let you speak, and I'm

going to let you make any comments that you wish to offer.

MR. GLEASON:  Good afternoon, Your Honor.

THE COURT:  Good afternoon.

MR. GLEASON:  First of all, I wish I would have had

time to prepare today so I could bring professional witnesses

in.

And for my appearance, for some reason, Sussex will

not allow me to have my beard trimmed or my hair.  That's why

I'm looking the way I am now.

Dr. Hagan does have the report from John Umstead,

Butner.  I OD'd by accident on my friend's pills.  It wasn't a

suicide attempt.  He knows about that.

1    Before I even had these attorneys, I told Dr. Hagan

2  about some cases, what attorneys do at the last moment, they

3  make up things, like Mr. Sheldon has today.  I said, "So every

4  week I would like to have a phone call with you, all the way

5  up to my date of execution, just in case an attorney" -- like

6  Mr. Sheldon is doing today.  Every week I've talked to

7  Dr. Hagan, from September 2011 until August, when Mr. Sheldon

8  told Dr. Hagan, "Do not talk to him no more."

9    My frustration with my attorneys is people that are

10  close to me, I asked please leave them alone.  They've been

11  through enough.  Please just leave them alone.  He has had

12  attorneys go down to Florida, talk to people that's close to

13  me, kids, sisters, everybody in my family.  I wanted them to

14  stay out of it.

15    THE COURT:  What about some other attorney?

16    MR. GLEASON:  Excuse me?

17    THE COURT:  How about some other attorney?  If you've

18  lost patience with Mr. Sheldon or his associates, how about

19  having me appoint some other attorney to look into these

20  issues?

21    MR. GLEASON:  What issues is that?  The stuff he is

22  saying today is a lie, saying I said I feel like I'm being

23  poisoned.  You can ask any staff member that comes in how I

24  act.  I do go outside to rec.

25    The one time I refused to see them is when they were

1 first appointed. I said, "Let's do the telephone interview,

2 because I have to wear a safety smock, and there's two baby

3 killers on the pod that laugh about it and I would rather not

4 go through it." He came up anyway. I refused to come out.

5 So the next time I called up, said, "You know what,

6 why don't you guys come up?" The only one that came up was

7 Rob Lee, my other attorney, and Mr. Flood. And I repeatedly

8 asked Mr. Lee and Mr. Flood for attorney visits. They have

9 not come up. I've had them, since the end of June, one

10 attorney visit from Flood, that's it.

11 THE COURT: See, they don't represent you. They

12 would like to represent your interest. But as it stands now

13 before this Court, they have no formal role. So if they're to

14 represent you and come and respond to your inquiries and

15 requests, they have to be vested with some formal role in the

16 case. And that's what he is asking for today.

17 MR. GLEASON: I understand. But he was hired on for

18 habeas corpus. I'm not filing anything. Why you guys

19 bothering my family? Please leave my family alone. That's

20 what I get upset about.

21 And the stuff that's going on at the institution,

22 they weren't doing anything. I gave Flood the exact address

23 to the Inspector General's Office, Carl Yates, the complete

24 address, everything. I just didn't have the phone number. I

25 said, "If you can't get the phone number, talk to Adrian

Collins, the Commonwealth attorney, they're friends." He
tells me he googled his name and couldn't find him.

That's the stuff that I get upset about. Like today,
I didn't know anything about this until 24 hours ago. I would
have had Dr. Hagan come in here and do the evaluation.

And the reason why Dr. Ryan wrote that, because I was
letting Lonnie Kern go, because I told him, "I'm pleading
guilty so this ain't on your conscience and your career
record. I'm going to let you go. We're going to court." And
the next day, I already had a motion drawn up to release him,
and he knew that.

And Walt Rivers and Charles Bledsoe, I could have
them come in this courtroom and say that letter was crap.
Excuse my language. Because when I got ahold of it, I said,
"What is this?"

They said "That's something that Lonnie Kern did."

I could also have Greg Kallen testify on that behalf.

Also, I could have Walt Rivers and Charles Bledsoe
confirm David Brook said, "Don't allow Mr. Gleason to
represent himself. Just tell him that -- tell the Court that
he's not competent."

He's, like, "We can't do that. There's two doctors
already said he is competent."

"Well, we can get a doctor like we did for Mohammed,
from New York, to represent him."

1      And Walt Rivers said, "Well, we all know how that

2  turned out."  It didn't turn out too well.

3      There's one more case.  There's a *Shannon Johnson v.*

4  *Delaware* that I brought to their attention, "Please, don't

5  drag this out."  The high court -- or a higher court granted

6  the stay, but it went to another higher court, and they said

7  that judge abused his power on granting that.

8      Look it up, Your Honor.  It happened this year.  It

9  was in the newspaper, and I gave that to them.

10      Please, don't do this to my family.  They need time

11  to heal.  My family went through this with my brother, when he

12  was beat to death in prison.  I know what it's like.

13      THE COURT:  Mr. Sheldon mentioned something about

14  concern with telephone privileges.

15      MR. GLEASON:  They took my phone away for six months.

16      THE COURT:  Who did you want to call?

17      MR. GLEASON:  My family, my friends.

18      THE COURT:  What did you want to talk about?

19      MR. GLEASON:  You know, if they had anything they

20  want to say.

21      THE COURT:  Do you know how this is going to end up?

22      MR. GLEASON:  Yeah.  It's not good.

23      THE COURT:  What do you see as the end of this whole

24  legal entanglement?

25      MR. GLEASON:  Death.

1          THE COURT:  And that's something you've thought

2     about?

3          MR. GLEASON:  Yeah.

4          THE COURT:  Have you talked to your family about it?

5          MR. GLEASON:  Yeah, talked to my family about it.

6     I've had umpteen evaluations about it.

7          THE COURT:  Have you spoken to anyone outside your

8     family about your prospects, about your future?

9          MR. GLEASON:  Yeah.  I talked to officers, friends

10    out on the street.

11         THE COURT:  Have you been unable to talk with any

12    people who you think you might want to speak to about the

13    decisions that you've made?

14         MR. GLEASON:  Yeah, the last six months I haven't

15    been able to use a phone.  I wanted them, for their own

16    conscience, to say whatever they needed to say and whatnot,

17    and I haven't been able to use a phone, even after I get the

18    execution date.  In fact, I asked her to be present by phone

19    for the hearing setting a date of execution.

20         He's just trying to say the other day that I was

21    being uncooperative, I didn't participate.  That's a lie, Your

22    Honor.  This is just a ploy to stretch this out, either to

23    line his pockets or his conscience about someone being

24    executed.

25         THE COURT:  He has strong feelings about this --

1     MR. GLEASON:  Yeah --

2     THE COURT:  And he has --

3     MR. GLEASON:  -- the death penalty.

4     THE COURT:  -- strong feelings about the standards

5 under which folks are executed.  He wants to make sure those

6 standards aren't compromised in your case.

7     MR. GLEASON:  I understand.  But you know what, Your

8 Honor, everything that he was saying today about saying I'm

9 saying people are trying to poison me or whatnot -- I can have

10 my family pay for a polygraph examiner -- everything he said

11 in there is a lie -- I'm guaranteeing I can pass that.  What

12 he is saying is a baldfaced lie.

13     There's a difference when you're trying to do the

14 right thing.  I deserve this.  I've hurt people.  This is the

15 charge and this is the punishment.  I can --

16     THE COURT:  As you sit here today, what do you want

17 to happen?

18     MR. GLEASON:  I don't want an attorney.  I want to

19 let the January 16th day go as is.  I would like to have my

20 phone privileges reinstated.

21     THE COURT:  And you want to go forward and have this

22 writ executed even though there might be some meritorious

23 obstacle that counsel could interpose that would at least

24 delay your execution or perhaps cause it to be vacated?

25     MR. GLEASON:  Your Honor, if it was true, then --

everything he is saying is a lie.  I've been above and beyond
cooperative.

THE COURT:  If it was true, what?

MR. GLEASON:  The lies that he's saying, that I'm not
competent, whatnot.  I am competent, Your Honor.

THE COURT:  And you feel this decision is the best
one for you, even though there might be something yet to be
discovered that could be interposed, that could be put before
the Court that might change the result that has been rendered
up to this point?

MR. GLEASON:  There's nothing to change that result.
The stuff that he put on today is a baldfaced lie.  Dr. Hagan
has that report.  We went through everything, everything.  He
did a very thorough evaluation, very thorough evaluation.

THE COURT:  Well, if there was something, would you
be interested in putting off your execution?

MR. GLEASON:  Like what?  There's no reason to put it
off, Your Honor.  There's nothing.  What is --

THE COURT:  If there was, is delaying your execution
something that you would like to pursue?

MR. GLEASON:  No.

THE COURT:  Is there anything else you want to tell
me?

MR. GLEASON:  They wasted the Court's time.  There's
a lot of money and people, resources.  They involved local,

1  state, and federal for me to be transported here today.

2          THE COURT:  I differ with you about wasting the

3  Court's time.  That's why the courts are here.

4          MR. GLEASON:  Well, Your Honor, if it's all for a

5  lie, yes, that's wasting Court's time, money, and energy.  And

6  everything he is said today is a baldfaced lie.  Dr. Hagan has

7  all that report in there.  I never ever said that I feel like

8  they're poisoning me.  That's a lie.  That's a lie, Your

9  Honor.

10          I've never seen this man.  Today is the first time

11  I've met him.  The first time I've met him, today, and he

12  knows that.  And I asked.

13          THE COURT:  It sounds like you've enjoyed the

14  litigation aspect of your case; is that true?

15          MR. GLEASON:  What do you mean, enjoyed it?  There's

16  nothing enjoying about it.

17          THE COURT:  Well, have you enjoyed doing the research

18  and looking into these cases and trying to find out what other

19  courts have said about situations similar to it?

20          MR. GLEASON:  That's what I had to do.  I didn't

21  enjoy going through all that and fighting the prison on trying

22  to get these legal materials.  In fact, I had to argue with

23  him to get legal materials.  And the person I was getting

24  legal materials from on the street, he called him up and asked

25  him not to give them to me no more.  It's not a point of

1  enjoying.  I had research I had to do.

2      THE COURT:  Again, though, why don't you ask me to

3  appoint an attorney for you who would give you the materials

4  that you want?

5      MR. GLEASON:  It's over with now.  There's nothing to

6  fight.

7      THE COURT:  Anything else you want to say?

8      MR. GLEASON:  No, Your Honor.  Thank you.

9      THE COURT:  Mr. Sheldon.

10     MR. SHELDON:  Your Honor, briefly.  I would just like

11 to point out that in the state habeas in this case, there's

12 absolutely no review.  For the most part, this case was over

13 with as soon as Mr. Gleason fired his attorneys and asked for

14 death.

15     In the state habeas, there was no review because no

16 court -- unlike what the warden says in his pleading, no court

17 had jurisdiction to entertain anything about competence for

18 Mr. Gleason.  And, of course, he's had no federal review.

19     You've had heard a lot of lay opinions about

20 competence.  I don't know whether Mr. Gleason is incompetent.

21 I can tell you, I've represented a lot of people.  A lot of

22 people are mentally ill.  And Mr. Gleason, I'm starting with

23 the situation of this whole case and his murders and turning

24 the whole death penalty on its head and murdering in order to

25 get the death penalty, and then our interaction with him, he

1    is about as troubled and difficult in his rational

2    decision-making and his ability to assist counsel as anybody

3    I've ever met.

4            He is difficult in things that we're trying to do

5    legally, he is difficult in things we're trying to do to help

6    his case, he's difficult in trying to do things where we're

7    trying to assist him in things he does want.  When he wants

8    legal research, I've tried to talk to him about it.  I can't

9    do it because --

10           THE COURT:  So at the most, you're talking about you,

11   as a layperson, disagree with the two professional opinions

12   rendered by folks who are trained to make these estimates

13   in --

14           MR. SHELDON:  No, I don't disagree with Dr. Ryan, who

15   has serious concerns about competency and thinks she should

16   get collateral interviews and do it again.

17           I do disagree with Dr. Hagan, who has not

18   acknowledged anywhere in his report, where he lists the

19   materials he has reviewed, the psychiatric records.  He has

20   not seen them, he does not list them, he does not acknowledge

21   he has ever heard of them.

22           I do disagree with Dr. Hagan when he said there's no

23   history of suicide, substance abuse, or mental illnesses, when

24   all the collateral reports say there are.  And then that was

25   15 months ago.

1    And the only thing an attorney can do when they have

2  serious concerns about competency is come to the Court and

3  proffer their interactions with their client.  That's all in

4  any case one can do.

5    THE COURT:  But you understand, as Ms. Burnett has

6  pointed out, that these psychiatric evaluations are

7  presumptively accurate and they're presumptively binding on

8  this Court because they were accepted and validated by the

9  state courts.  And those judgments are entitled to some

10  measure of finality, so they're binding here, and they are

11  presumed to be accurate.  And there's been no evidence

12  offered, as I understand it, that would suggest they are not,

13  other than lay opinions.

14    MR. SHELDON:  Right.  Other than the fact that

15  Dr. Hagan's report, which is the only report which I think

16  finds him competent, Dr. Hagan's report --

17    THE COURT:  No, there were two reports that have

18  found him competent.  One that you say may not be --

19    MR. SHELDON:  But Dr. Ryan --

20    THE COURT:  -- subscribed to --

21    MR. SHELDON:  Can I proffer that letter to the Court

22  from Dr. Ryan, which calls into question --

23    THE COURT:  Please do.

24    MR. SHELDON:  Dr. Ryan's letter, which comes about 11

25  months later, which says "I have serious concerns."

1          MS. BURNETT:  Could I see that, Your Honor --

2          MR. GLEASON:  May I say something about that?

3          THE COURT:  I'll give you a chance to speak about it.

4          MS. BURNETT:  -- and get a copy of it?  Thank you.

5          MR. SHELDON:  I don't have a copy for counsel.  I

6    only brought one copy.

7          THE COURT:  We'll make a copy.

8          MR. SHELDON:  The only thing an attorney can do when

9    they have serious concerns about their client's competence is

10   to bring it to the Court's attention.

11          And certainly if we were at trial and I had said --

12   regardless of what happened 15 months ago, there are different

13   circumstances.  He has been in solitary confinement for 15

14   months.  His ability to assist us and his rational

15   decision-making are seriously compromised; I've given you

16   numerous examples.

17          I think any court, and especially in this case where

18   the result is going to be the irrevocable imposition of the

19   death sentence, and there has been no review at the state or

20   federal habeas level, which is extremely rare, that the

21   proffer that I make, which is really the only thing I can do,

22   not being appointed here today, for this court -- and that's

23   all we are here for, appointment of counsel -- the only thing

24   I can do is make a proffer of the interaction we've had with

25   him.  And we have very serious and substantial concerns.

1    I have no objection whatsoever to somebody else being

2 appointed rather than me.

3    THE COURT:  There's no question about that.

4    Ms. Burnett, anything else that you would say about

5 it?

6    MS. BURNETT:  Not really, Your Honor, except that I

7 think the Court now has additional evidence this morning

8 [*sic*], and that is Mr. Gleason himself, who I think came

9 across as very intelligent and has given all of this a lot of

10 thought.

11    THE COURT:  He came across as somewhat rambling,

12 didn't he?

13    MS. BURNETT:  Well, I did not see any evidence -- I

14 have not heard any evidence of someone who is incompetent.  We

15 have someone who obviously has a troubled background and

16 troubled life.

17    That letter that I just looked through very briefly,

18 I did not see a single diagnosis in there of any mental

19 illness, or conclusion of incompetence even there.

20    MR. SHELDON:  Your Honor, I think the challenge for

21 today is that here we have all these lay opinions.  I can't

22 give a lay opinion to the Court, I can just tell you what my

23 interaction is.  And because I have not been appointed, I have

24 not briefed this issue, which I do know very well from

25 briefing in other cases, which is that competence can be, one,

intermittent, and it also can very often be over a particular

issue.  So somebody can sit here and talk for hours on end

logically about certain topics, but when it comes to other

topics, especially their case, their paranoia about their

case, they can be not competent.

In this case, I can tell you when we try and talk to

him about his case, the pressured speech, the perseveration,

the paranoia -- I have serious concerns, Your Honor.  And as a

layperson, that's all I can tell the Court.  I can't do

anything further than that.

THE COURT:  Yes, sir.  Thank you.

Anything else either of you would say about it?

Mr. Gleason, I told you I would give you a final say.

Anything else that you want to offer to the Court?

MR. GLEASON:  It's not the point that I'm rambling,

Your Honor.  The point is that I'm upset with them.  They're

lying.  I was not prepared today.  I could have had Dr. Hagan

in here today to contradict what he is saying.

That letter from Dr. Ryan is the same day I was

firing Lonnie Kern, by letting him go so this wouldn't be on

his conscience.  I could have Greg Kallen come in to explain

why Lonnie Kern did that.

You were saying about me being on death row for 15

months.  Me and Dr. Hagan talked about death row syndrome.  I

had him do an opinion about me, how I don't fall into that

1 category of death row syndrome.

2     This man here has been saying nothing but lies.  Yes,

3 I am a little bit upset because is he lying.  He is lying.  He

4 is wasting the Court's time, my time.  And if the Court wanted

5 to get a continuance and get Dr. Hagan in here to get his

6 opinion on it, to waste the Court's more time by his lies,

7 that's on you.

8     THE COURT:  All right.  Thank you, Mr. Gleason.

9     MR. GLEASON:  Thank you.

10     THE COURT:  Well, as I said, I think that the case

11 law on this issue is very clear.  I think that the state

12 determinations of competency have come to this Court with

13 great weight.  They're presumed to be accurate, they create a

14 presumption that is difficult to overcome, and one questions

15 whether or not there's been any evidence offered today that

16 would be sufficient to overcome that presumption created under

17 the law.

18     So it seems to me that under the case law in this

19 circuit and outside this circuit, the motion is without merit.

20     But I had not seen Dr. Ryan's report until today.  I

21 will study it.  I will look at the report, consider whether or

22 not it may constitute some objective evidence that might be

23 sufficient to weigh against the presumption, and we'll try to

24 render an opinion just in the next several hours.

25     But as I indicated, it seems to me that the law in

1  this area is very, very clear.

2  MR. GLEASON:  Can I make one more comment, Your

3  Honor?

4  THE COURT:  You may, sir.

5  MR. GLEASON:  I apologize.  But Walt Rivers and

6  Charles Bledsoe had a problem with Dr. Ryan.  They said she

7  was wishy-washy.  They both said she was wishy-washy.

8  I had Dr. Hagan do also an evaluation, just not on

9  Cooper, but for the Watson, so this particular incident

10 wouldn't happen.  Look at Dr. Hagan's report.  He told the

11 truth.

12 THE COURT:  Yes, sir.  Yes, sir.

13 MR. GLEASON:  That's it.

14 THE COURT:  Anything else anyone would say before the

15 Court concludes this matter?

16 MR. GLEASON:  Can you look up the *Shannon Johnson*

17 *case, versus Delaware*?

18 THE COURT:  Sir, I assure you we will look up every

19 case that has a bearing on this issue.  It's an important

20 issue, it's well before the Court, and I guarantee you it will

21 be given thorough consideration.

22 Good luck to you, Mr. Gleason.

23 MR. GLEASON:  Thank you, sir.

24 THE COURT:  If there's nothing further to come before

25 the Court, I'll ask the marshal to declare court in recess

1  until return of court.

2      (Court recessed at 1:38 p.m.)

3

4                    CERTIFICATE

5  I, Judy K. Webb, certify that the foregoing is a

6  correct transcript from the record of proceedings in

7  the above-entitled matter.

8

9  /s/ Judy K. Webb              Date: 1/5/2013

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25